**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

GRASS VALLEY TERRACE, a
California Limited Partnership, *et al.*

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

**File No. 98-726C**

**(Judge Edward J. Damich)**

**DECLARATION OF MARGARET S. WILCOXON**

I, Margaret S. Wilcoxon, declare as follows:

1. I am one of the four heirs of Marjorie W. Kassner, who is now deceased. Marjorie Kassner is named as plaintiff No. 3 in the above-captioned action. I am 65 years old. I make this Declaration in opposition to defendant's motion for summary judgment regarding plaintiffs' contract and takings claims. All facts asserted herein are based upon my personal knowledge.

2. Marjorie Kassner was the owner of the following housing complex: Wyandot Village Apartments, 111 S. Riverbend Drive, Douglas, Wyoming 82633. This complex was issued a mortgage by the Farmer's Home Administration ("FmHA") on February 6, 1979. Exhibit A. The contract with the Government is also reflected in a Loan Agreement dated January 13, 1978 and a promissory noted dated February 6, 1979. Exhibits B and C. The property was initially bought by Marjorie and Robert, her husband, who held the property without any restrictions on its use for a period of time before the FmHA loan closed. They subsequently divorced and Marjorie became sole owner until her death. This property is now

EXHIBIT A

held by the estate of Marjorie Kassner, of which I am an heir. I was Marjorie's business partner and close friend for many years and have been personally involved in the acquisition, management and attempted (but unsuccessful) prepayment and sale of this property.

3. Absent FmHA's promise that the owner would be able to prepay at any time, I know that Marjorie and her husband would never have entered the Section 515 program. From the discussions that Marjorie, Robert and I had with FmHA, it was our understanding that the owners not only could but were expected to refinance the project as soon as possible, and we were strongly urged to do so, which we fully intended to do.

4. I know that Marjorie, like me, understood that the right to prepay and leave the program was contractually binding upon the government and could not be changed without another agreement in writing with the government.

5. Marjorie did not enter into the contract with the government for the purpose of obtaining a low-interest rate loan. Rather, she (and I) undertook this business venture for the long-term investment value of the property. In other words, we agreed to the government's restrictions on the use of the property in exchange for the owner's right to achieve the value of the property as a commerical rental complex by prepaying at the appropriate time for us. Without this right, there would have been no purpose and no incentive to enter into the contract.

6. The interest rate on the loan provides the owner no benefit whatsoever. This is because the <u>only</u> profit the owner can receive while in the program is the 8% return on initial investment permitted under the loan agreement. This annual return reamins the same regardless of how much equity has been built up and regardless of the property's fair maket value.

7. The only individuals who gain any benefit from the interest rate paid on the loan are the tenants. The tenants benefit in the sense that the rental assistance provided by the government works as an effective credit against a portion of the interest due on the mortgage, which permits the project finances to work out in a manner that allows rents to remain low. Again, this serves as no benefit to the owner, who cannot obtain the value or purpose of investment unless and until the mortgage is prepaid. Thus, without the ability to prepay and get out, Marjorie would never have entered into the agreement in the first place.

8. Marjorie and I had multiple meetings with FmHA officials, including the District Director and Assistant District Directors, during which we were repeatedly told that, despite the contract, the law had changed and FmHA could not accept any prepayment without restriction.

9. Finally, despite FmHA's repeated statements that it could not accept prepayment without restriction, on May 30, 1994, Marjorie Kassner submitted a written request to prepay this mortgage without restriction, requesting to prepay on December 1, 1994. Exhibit D (attachments omitted). This request was prompted by the fact that we had received an attractive, credible offer for the property from a private party. In addition, Marjorie was at the point in her life that she direly needed to get out of the FmHA program and the property management business and reap the benefit of this investment.

10. FmHA denied the request to prepay without restriction. Exhibit E. Instead, the FmHA informed us that the property likely qualified for an equity loan which could be used to finance a sale under the government restrictive guidelines. Id. However, FmHA informed us that it did not have enough funding to make the equity loan and so the transaction

would have to be put in a waiting line for funding. At that time, FmHA told us funding was likely to occur within 12 months.

11. We stayed on the waiting list for an equity loan because this was the only viable option for us under the circumstances, given that FmHA refused to accept prepayment without restriction. Exhibit F. The buyer was willing to go through with the transaction, even within the government's restrictions, using the funds from the equity loan to make the transaction work for both parties.

12. FmHA's 12-month estimate of the waiting time for funding, however, proved grossly inaccurate. In July of 1996, FMHA said the property was three years away from funding. Exhibit G. This again proved wrong. In point of fact, the property still has not received funding to this day, more than six years since the prepayment request was made.

13. In 1998, Marjorie Kassner was diagnosed with myelogenous leukemia, a debilitating and life-threatening illness. At that point, it became absolutely critical that FmHA fund the transaction that would relieve her of the ever-growing burden of this property. Marjorie and I did everything we possibly could, working through our elected Senators and Members of Congress, to get FmHA to move on the prepayment request as a hardship case and fund the equity loan. FmHA did nothing.

14. Marjorie died on September 8, 1999. Her children and I are convinced that the tremendous stress created by the Government's terribly unfair and callous treatment of her in her effort to prepay and sell this property was a major contributing factor in her death. Marjorie herself described the situation in one 1999 letter as a "choking chain around my neck." Exhibit H.

15. Marjorie lost a great deal of money as a result of FmHA's denial of her request to prepay without restriction. She would have sold this property at an excellent price in 1994, if not sooner, had FmHA honored its contract. Instead, the property remains unsold to this day and its resale value now is likely far less than in 1994—especially with the government restrictions in place. And the money is only part of the loss. Instead of selling at a profit and retiring, Marjorie went through years of frustration and worry about the burden this property was on her and would continue to be on her loved ones after her death. It is impossible to compensate through money the loss she and her family have suffered due to being imprisoned in this FmHA program which, in 1979, Marjorie entered based on the promise that she would be free to leave upon prepayment in full at any time at her option.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 30, 2000 in Douglas, Wy.

Margaret S. Wilcoxon
Margaret S. Wilcoxon

M2:20329834.03