IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GRASS VALLEY TERRACE, *
A CALIFORNIA LIMITED *
PARTNERSHIP, et al., *
Plaintiff(s) *
*
VS. * NO. 98-726C
*
THE UNITED STATES, *
Defendant(s) *

**********************************************************************

ORAL DEPOSITION OF RUSSELL KASSNER

**********************************************************************

ANSWERS AND DEPOSITION OF RUSSELL KASSNER, produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 3rd day of June, 2004, A.D., beginning at 12:46 p.m., before Jeannye L. Skinner, a Certified Shorthand Reporter in and for the State of Texas, in the offices of Associated Court Reporters, located at 425 Austin Avenue, Suite 2102, Waco, Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth.



EXHIBIT C

Page 10

relating to the section 515 program?
A. Not to my knowledge.
Q. Did you at some point become a part owner of Wyandot Village?
A. Yes.
Q. We'll come back to this in more detail later, but could you just for some context indicate when and how?
A. It was in -- I think my mother deceased in -- I think it was in '98, I think. I'm not for sure. And it was because of my mother's decease.
Q. You inherited it?
A. Yes.
Q. A share -- an interest in the property?
A. Yes.
Q. And do you still have an ownership interest in Wyandot Village?
A. No, sir.
Q. It was sold?
A. Yes.
Q. We'll come back to this, but let me go back and ask you. Prior to your inheritance of an interest in Wyandot Village, did you have any role in managing the project?
A. In managing it, no, I didn't. Although, I did have an -- ongoing conversations with my mother about what did take place and what didn't take place. And at time to time I did go

Page 11

over and work on the project to help her do general maintenance on it.
Q. During that time, did you help her in dealings with Farmers Home Administration or the Rural Housing Services it later became known?
A. No, I did not.
Q. Other than some of the activities that you did to help your mother on the Wyandot Village project, do you have any experience managing real estate?
A. Yes, I do.
Q. Can you describe that?
A. I've owned different duplexes at a period of time. I owned two different duplexes in Douglas at one period of time.
Q. Are these -- are these rental properties?
A. Yes.
Q. Are they under any subsidized or low income housing program?
A. No. They are commercial properties.
Q. Commercial as opposed to residential?
A. I mean, they are residential but they are -- they aren't subsidized in any way.
Q. Is that a sideline investment or is that the area that you work in?
A. It was an investment -- sideline investment.
Q. What -- where are you currently employed?

Page 12

A. I am employed for Devon Energy Corporation.
Q. How long have you been employed there?
A. Well, original -- they were bought out. The corporation was bought out. I worked for a corporation by the name of Mitchell Energy for -- see, it'd be 21 years, I think. And then for the last two years, we've been underneath Devon Energy.
Q. By the way, I don't know if you're speaking softly or just my ears haven't opened from the airplane, but I'm having a little trouble hearing you. It might be me. So I'd ask you to speak up just a little. Because I'm having trouble hearing myself as well. The -- what sort of work is that?
A. Oil and gas company.
Q. About how long have you done that work?
A. 24, 25 years, right in there.
Q. Now, I want to show you a document which I'm going to ask the reporter to mark as Exhibit 200.
MR. BRILLIANT: We're starting with 200 because there's another deposition going on simultaneously. So I don't know what the number is going to be in that. So we'll just pick up from 200.
MR. BLANDO: Okay.
MR. BRILLIANT: There'll be a gap, but we'll straighten that out later.
(Exhibit No. 200 marked.)

Page 13

MR. BRILLIANT: Off the record for a moment.
(Off the record for less than one minute.)
Q. (BY MR. BRILLIANT) Now, the document that I've just shown you that we've had marked as Exhibit 200 appears to be a declaration signed by Margaret Wilcoxon in this case in October 2000. First let me ask you, do you recognize the signature on page 5?
A. Yes.
Q. And does that appear to you to be the signature of Margaret Wilcoxon, if you know?
A. As far as my -- as far as I know, it is.
Q. And you mentioned before among the documents you reviewed, I think you said you reviewed this declaration; is that correct, is this the declaration you meant?
A. Yes.
Q. Who is Margaret Wilcoxon?
A. Margaret Wilcoxon was -- she -- explain what you mean.
Q. She's a person you know; is that correct?
A. Yes.
Q. Did she have any involvement relating to the Wyandot Village project?
A. Yes.
Q. In general terms, can you say what that involvement was?
A. She assisted my mother in the management of the

Page 74

see it says our main concern with the project remains the vacancy. The physical vacancy in 1999 was 18.9 percent. Do you know whether this is accurate or not, that is, whether the vacancy rate in 1999 was about 18.9 percent?
A. No, I don't.
Q. I'll ask you to look at Exhibit 209.
(Exhibit No. 209 marked.)
Q. Okay. I'll give you a moment to or whatever number of moments you might need to look at this, but just by way of introduction, this appears to be a record of a phone conversation written by Jack Hyde, that is, it's the form is Department of Agriculture Rural Development record of telephone call or office visit. And it's filled in in handwriting, and it indicates April 17th, 2001, and it states that there was a telephone call between yourself and Jack Hyde. And then under the message section it goes on -- it says Russell called with questions and goes on to talk about the conversation. My question to you is -- after you look at this -- do you recall the conversation described in this document?
A. I recall some similar conversations. I can't say that I recall this exact one.
Q. In general terms, does this appear to accurately describe the conversation?
A. I can't say because I don't remember the conversation. I mean, I remember I had some conversations with him, but I

Page 75

can't per se that this is every word that was said in the conversation.
Q. Well, what I would ask you now is just based on your best recollection, is there anything here where you would look at this and say, no, I didn't say that. I said this. Or Jack didn't say what this says; he said something else?
A. I can't even remember what I said that long ago. How am I going to be able to argue with what was in here?
Q. I'm not -- I'm just asking you if you -- if you recall --
A. What did you ask me then?
Q. I'm asking you if you recall -- if based on whatever you recall, is there anything inaccurate about this description?
A. I can't say yes or no because I don't know. I don't remember the exact conversation that this -- I'm supposed to have had with Jack Hyde.
Q. You recall at all raising generally the questions that he said you raised and the questions about how sale proceeds and equity would be handled if transferred and Machacek occurs the issues about estimates for proposed rehab and so on? Do you remember just generally contacting Jack Hyde and asking him about these things?
A. No. I remember having concerns about them, but I don't remember exactly who I talked to or when.

Page 76

Q. Do you recall talking to anybody at the agency, just calling the agency and whoever you spoke to at some time in this general time frame?
A. I think I remember talking to a woman there, but I can't remember whether I talked to -- I think I have talked to a couple of different gentlemen, but I'm not for sure, you know, who they were.
Q. Okay. Let me ask you to look at something which I'll ask to have marked as Exhibit 210.
(Exhibit No. 210 marked.)
Q. Okay. Now, this appears -- it's Bates numbered GV1239 through 1247. First page is just a fax transmittal sheet. I'd like to direct your attention to the rest of the document and ask you if you can -- if you can identify this, say what this is, what's it about?
MR. BLANDO: Are you just referring to the first letter?
Q. (BY MR. BRILLIANT) Well, let's start with the first letter, page GV1240. This appears to be a letter to you and to Mark Walker and to Gretchen Kassner from an attorney James Hardee regarding the estate of your mother. And putting aside the handwritten part here, which I don't represent is actually part of the letter. But the opening of the letter says that it's enclosing a check for a cash distribution of the estate and then it says also enclosed please find a copy of the

Page 77

assignment assigning the option to purchase the Wyandot Village property to the three of you. Do you recall getting this letter and its attachments?
A. When my mother passed away, I received so many letters. I don't know whether I did receive this one or not.
Q. Do you recall that the assignment -- if you look at the last page, page GV1247, that appears to be an assignment from the estate to you, Mark Walker and Gretchen Kassner as heirs -- well, an assignment to you three of the estate's interest in property described in the bold -- boldface print just below that; is that correct; do you see that?
Basically what I'm just trying to confirm here, this indicates to me that the estate assigned your mother's ownership of Wyandot Village to the three of you as part of the administration of the estate. That is what happened, isn't it?
A. Yes.
Q. I'm just tying up loose ends in terms of...
MR. BLANDO: I should just note for the record I think Exhibit 210 might have a page or more missing because if you go from GV1246, it looks like the last page of the option isn't there. 1247 is the assignment.
MR. BRILLIANT: Yeah, you're right. It does -- it does seem that way. Yeah.
Q. (BY MR. BRILLIANT) Ask you to take a look at the document I'll ask to have marked as Exhibit 211.



Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

(Exhibit No. 211 marked.)
Q. This appears to be a letter from the agency from Rural Development to you dated January 25th, 2002, with attachments. Do you know what this is about? Do you remember receiving this letter?
A. Yes.
Q. Do you know what prompted this letter?
A. Yes. A letter that I wrote them.
Q. And I don't have that here, but just in general terms, do you recall what issues you raised in your letter that this was addressing?
A. Probably the things that they talked about in here to address them.
Q. Did this answer the concerns or questions you raised in your January 12th, 2002, letter?
MR. BLANDO: January 18th. I thought you said January 12th.
Q. (BY MR. BRILLIANT) I'm sorry, January 18th?
A. I don't know for sure.
Q. All right. I want to show you now something which we'll mark as Exhibit 212.
(Exhibit No. 212 marked.)
Q. And apart from the fax cover sheet that's on the first page, are you familiar with this document?
A. No, not with all of it.



Q. Well, let me ask you to look at the page GV942 -- I'm sorry, page GV940. That appears to have signatures by you, Gretchen Kassner and Mark Walker by James Hardee. Now, James Hardee was your attorney; is that correct?
A. Personally, no.
Q. He was the attorney for the estate?
A. Correct.
Q. He was not your attorney?
A. No.
Q. Do you know -- it appears that he signed for all three of you. Was he authorized to do that?
MR. BLANDO: That might call for a legal conclusion.
Q. (BY MR. BRILLIANT) Well, I'm asking did you authorize Mr. Hardee to sign on your behalf?
A. Yes, I did. Because we were stuck in a box. As you can tell from this earlier letter that you put in here, they were not going to let us out on the approval.
Q. No, no, no --
A. Then we continued to go on as if the appraisal that they used was from my mother's estate, not their own appraisal which they did later on. At that period of time, that appraisal was significantly higher than the appraisal that was done for my mother. At that period of time, the appraisal included 3.4 acres that were additional, which is out of the



estate, which is significantly higher than the one that it was sold on this property.
Q. What happened to those acres?
A. It ended up by being sold in with the property because they told us we couldn't sell the property unless we put it in there. They stuck us in the box and they were going to crush us. There was no way that we could have got out of this without doing this. Either we were going to lose the property and blow all the equity that my mom had worked for years to ever get or we were going to sell it at a diminished price that they set.
Q. So you did authorize Mr. Hardee to sign for you as opposed to your signing yourself?
A. Yes.
Q. Okay. That's all. If you look at line 603, you see it's the last item on that page, cash to or from seller and it has an X marked next to 2. That appears to say that after all the additions and subtractions and so on, that the net cash to the sellers -- that is you and Gretchen Kassner and Mark Walker -- was $482,795.63. Is that in fact the amount received by the sellers for the property?
A. True. But if they would have gone through and let us go ahead and sell it in 1994 or get out of the program in 1994, by this period of time, the property could have been worth 3 million dollars.



Q. Do you know what the general trends were in real estate values between 1994 and the date of this document?
A. No.
Q. Or actually the date of the transaction?
A. No.
Q. I have no other questions.
MR. BLANDO: Let's take a break.
(Break taken from 3:58 p.m. to 4:04 p.m.)
BY MR. BLANDO: I don't have any questions for the witness. And we will reserve our right to review and sign the transcript.
(End of proceeding at 4:04 p.m.)